UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SAGENT PHARMACEUTICALS,

           Plaintiff,

      v.

FARCO USA, LLC, a Delaware limited
liability company, ROBERT P. SZURGOT,
MATTHEW BLASIK, and PETER W.
JENSEN,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

25 C 14080

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Sagent Pharmaceuticals ("Sagent") brought this action against Farco USA, LLC ("Farco USA"), and three former Sagent employees, Robert Szurgot, Matthew Blasik, and Peter Jensen. Sagent alleges breaches of contract, misappropriation of trade secrets, and other tortious conduct in connection with Sagent's business relationship with a German pharmaceutical company, FARCO-PHARMA GmbH ("FARCO-PHARMA"). Defendants collectively move to dismiss the trade secrets and tortious interference claims, as well as all claims against Jensen. For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Sagent develops, sources, manufactures, and markets medical products used by hospitals, dialysis centers, and other health care organizations. Relevant to this case, Sagent acts as a distributor for FARCO-PHARMA, which manufactures GLYDO, a lidocaine jelly used during medical procedures.

In 2010, Sagent and FARCO-PHARMA entered into a License and Supply Agreement ("LSA") that gave Sagent exclusive U.S. distribution rights for GLYDO. The LSA was amended in 2020 to provide for a termination date of December 31, 2026, subject to automatic renewals every two years thereafter unless either party provides written notice prior to the applicable renewal term.

Before joining Sagent, neither Szurgot, Blasik, nor Jensen had any experience with urology products or their distribution. Szurgot worked for Sagent for about sixteen years. As Vice President of Specialty Pharmaceuticals, Szurgot was responsible for marketing and sales strategies for Sagent's urology products. Blasik worked for Sagent for nearly eight years. As National Sales Director of Urology, Blasik reported to Szurgot and worked exclusively on GLYDO sales. Jensen worked for Sagent for approximately twelve years as Vice President of Finance. His employment with Sagent was terminated on June 19, 2024, when Sagent eliminated his position.

Sagent alleges that, beginning at least as early as Fall 2023, Defendants conspired with FARCO-PHARMA's Managing Director, Marc Vollenbroeker, to terminate the LSA prematurely and create Farco USA as Sagent's replacement. Szurgot engaged in

2

various email, text, and in-person communications with Vollenbroeker and FARCO-PHARMA's Manager of International Sales, Nina Aadahl. For example, on December 6, 2023, Vollenbroeker texted Szurgot: "Hi Bob, finally green light. I will pimp up a little bit your/[Jensen's] business case (more details) and will send it to you. Based on your agreement this [business case] will be the basis for the loan. And then we should start to dance." Complaint, Dkt. # 1, ¶ 61 (brackets in complaint). On December 11, 2023, Vollenbroeker asked Szurgot if he "had the chance to review 'your' business case? It will be the base for the loan." *Id.* ¶ 64. Vollenbroeker further wrote to Szurgot: "I will contact [Sagent's CEO] during this week in order to terminate the contract. We should go ahead – step by step, but ahead for your future FarcoUS business." *Id.* ¶ 65.

On December 14, 2023, Vollenbroeker asked Szurgot for feedback on a draft LSA termination email addressed to Sagent's CEO. Szurgot responded that he would review the draft.

At a meeting on or about January 15, 2024, FARCO-PHARMA and Sagent discussed the possibility of a joint venture, but Vollenbroeker sent an email on January 23, 2024, informing Sagent that the supervisory board rejected the joint venture concept. Attached to that same email, FARCO-PHARMA sent Sagent an official termination regarding the LSA, purporting to terminate it on September 30, 2024. However, FARCO-PHARMA eventually "backed off" from its December 2023 and January 2024 attempts to terminate the LSA prematurely.

3

Throughout January and into February 2024, Szurgot also participated in attorney-client privileged discussions with Sagent's management team and General Counsel about Sagent's negotiation strategy for its meetings with FARCO-PHARMA. On February 1, 2024, Szurgot sent Vollenbroecker a text message stating "The plan is to play good cop bad cop with you. [Sagent's CEO] will be nice while [Sagent's General Counsel] will play tough. He will push back you cannot break agreement until end of 2026. If you want to leave earlier than [*sic*] you win [*sic*] have to buy out of the contract. Not sure if you want to start the bad discussion with [Sagent's General Counsel] first or move it to your legal team now." *Id.* ¶ 84 (brackets in complaint, emphasis removed).

On March 14, 2024, Sagent interviewed Blasik and Szurgot as part of an investigation. Szurgot feigned ignorance about why FARCO-PHARMA wanted to terminate the LSA and said he was "kept out" of those discussions. He did not disclose that he had shared Sagent's privileged negotiation strategy with Vollenbroeker. Blasik said that FARCO-PHARMA never contacted him about a job or terminating the LSA, although he had received an email from Vollenbroeker on October 8, 2023, stating: "Give me a hint, when you are ready to talk about your bright future as a partner of Farco!" *Id.* ¶ 56.

On March 19, 2025, Blasik emailed a spreadsheet containing over 1,500 of Sagent's hospital division contacts to his personal email address. On June 27, 2025, Szurgot used his work email to send two draft term sheets between Sagent and two of

4

its business partners to his personal account, naming the documents "Golf One.docx" and "Golf2.docx." The documents contained confidential information. Sagent believes Szurgot misappropriated the documents so Defendants could use them as a template for their own contractual negotiations with potential Farco USA customers.

In July 2025, Szurgot and Blasik took paid time off to attend FARCO-PHARMA's 60th anniversary event in Germany. Neither of them informed management of their plans to attend the event. Vollenbroeker later emailed Szurgot and Blasik thanking them for their attendance at the anniversary event. Blasik forwarded the email to his personal email account and then deleted it from his work email account.

On or about August 15, 2025, Szurgot and Jensen met with attorneys to discuss the formation of Farco USA. Sagent believes Defendants were also concurrently working with an investment banker to assist with the funding for Farco USA. On August 25, 2025, a friend of Szurgot's sent an email introducing Szurgot to an investment banker. The friend wrote that "Bob oversees the product line for a product manufactured by a German company and has exclusive distribution in the US. The contract is ending soon and Bob is working with the German company to start up a new company dedicated to the distribution of the current and future product lines[.]" *Id.* ¶ 111.

On August 27, 2025, and September 18, 2025, Blasik downloaded numerous confidential files containing details about customer relationships from his work

computer to a personal USB drive. Also on September 18, 2025, Jensen filed the application to incorporate Farco USA as an LLC. Jensen also funded the Farco USA bank account with $30,000.

On September 1, 2025, FARCO-PHARMA sent Sagent a letter purporting to terminate the LSA early, on June 30, 2026. Sagent fired Szurgot and Blasik on October 14, 2025, after discovering additional evidence of their misconduct.

Szurgot, Blasik, and Jensen signed confidentiality agreements as a condition of their employment, pursuant to which they agreed to protect Sagent's confidential information and refrain from engaging in conflicting employment. They understood that they were responsible for reading, understanding, and complying with the policies contained in Sagent's Handbook, the Code of Conduct, and their individual confidentiality agreements. Szurgot, Blasik, and Jensen agreed "at all times during the term of [their] employment and after termination, to hold in the strictest confidence, and not to use, except for the benefit of [Sagent], or to disclose to any person, corporation or other entity without the written consent of [Sagent], any Confidential Information." *Id.* ¶¶ 205, 221, 237.

In Jensen's Separation Agreement, Jensen acknowledged and agreed that he had a continuing obligation to protect Sagent's confidential information. He specifically represented, warranted, and confirmed that he "has not engaged in and is not aware of any unlawful conduct relating to the business of [Sagent]." *Id.* ¶ 44. The Separation Agreement set forth Jensen's "continuing obligation to protect Confidential

Information in accordance with all applicable statutory and common laws." *Id.* ¶ 46. laws." Jensen was prohibited from accessing, using or disclosing confidential information "directly or indirectly at any time for the Employee's personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interests of [Sagent]." *Id.* Jensen further promised to "take all action reasonably necessary to protect Confidential Information from being disclosed to anyone other than persons authorized by the Company." *Id.* He also affirmed that he "has not used any Confidential Information or other Company property for competitive purposes." *Id.* ¶ 47.

Based on the foregoing, Sagent brought suit against Defendants, alleging claims of violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(3)(C), violations of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/4(b), breach of fiduciary duty, unfair competition, civil conspiracy, breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, and unjust enrichment. Sagent seeks various forms of damages and other monetary relief under all its purported causes of action. Sagent further seeks injunctive relief under DTSA and ITSA, including "an injunction to prevent Defendants' further misuse and/or misappropriation of Sagent's trade secrets, and to prevent the Individual Defendants from working on GLYDO for at least two years." *Id.* ¶¶ 154, 167. Defendants move to dismiss the DTSA and ITSA claims and the tortious interference claims, as well as all claims against Defendant Jensen.

7

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. Misappropriation of Trade Secrets

ITSA and DTSA prohibit the misappropriation of trade secrets under Illinois and federal law, respectively. Because the statutes are substantially similar, courts can analyze separate claims brought under these laws together. *See Petrochoice LLC v. Amherdt*, 2023 WL 2139207, at *7 (N.D. Ill. 2023). A plaintiff bringing ITSA and DTSA claims must show "that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *REXA, Inc. v.*

8

*Chester*, 42 F.4th 652, 662 (7th Cir. 2022) (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)); *see also Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4034068, at *12 (N.D. Ill. 2021) (DTSA claim requires same elements). Defendants do not meaningfully challenge Sagent's contention that much of the information at issue constitutes trade secrets.[1] Rather, Defendants primarily argue that Sagent's allegations merely show possession of trade secrets, not misappropriation.

"Misappropriation can be shown one of three ways—by improper acquisition, unauthorized disclosure, or unauthorized use." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819 (N.D. Ill. 2014). "Direct evidence of trade secret misappropriation is rare." *BCD Tech. Holdings, LLC v. Paragon Micro, Inc.*, 2026 WL 788078, at *8 (N.D. Ill. 2026). Consequently, plaintiffs in trade secrets cases often "must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place." *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *5 (N.D. Ill. 2013) (citation and internal

---

[1] Defendants do take issue with Sagent's contention that its attorney-client privileged negotiation strategy (which Szurgot disclosed to Vollenbroeker) constitutes a trade secret. Defendants argue that "a 'good cop bad cop' negotiation strategy is a 'time-honored technique.'" Dkt. # 31, at 11 (citing *Negotiations among lawyers—Good cop/bad cop*, 4 Bus. & Com. Litig. Fed. Cts. ¶ 42:41 (5th ed.)). Sagent, in response, contends that the "good cop, bad cop" strategy included specific confidential information, the roles that specific individuals at Sagent would play, and the legal arguments Sagent's General Counsel intended to advance. The Court need not decide this issue today, however, because Sagent has identified other trade secret information that was allegedly misappropriated.

quotation marks omitted); *see also RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (plaintiffs "can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence."). "At the motion-to-dismiss stage, a plaintiff is even less likely to have such information." *Switchboard Apparatus, Inc. v. Wolfram*, 2021 WL 2311969, at *5 (N.D. Ill. 2021).

Sagent alleges Defendants misappropriated its trade secrets by "(1) misleadingly re-naming confidential files and sending them to their personal emails; (2) downloading confidential information to USB drives, which were not returned upon Defendants' termination; and (3) disclosing Sagent's proprietary information with respect to its negotiation strategy with FARCO-PHARMA." Dkt. # 1, ¶ 147. Sagent further asserts that Defendants' misuse and misappropriation of its trade secrets can be inferred under the "inevitable disclosure" doctrine.

An employee's "suspicious downloading of company information before his departure" or other efforts to "cover his tracks," may allow an inference of misappropriation, at least at the pleading stage. *Lumenate Techs.*, 2013 WL 5974731, at *5 (allegations the defendants "suspiciously downloaded the company's confidential information before leaving to join a direct competitor, 'covered their tracks' to prevent [the employer] from discovering what they had done, and then used that information to poach [the employer's] clients" sufficient to state a claim for misappropriation). Here, Sagent alleges that Szurgot surreptitiously renamed confidential term sheet documents and sent them to his personal email address so Defendants could use them as a template

for negotiations with Farco USA customers, and Blasik emailed over 1,500 of Sagent's hospital division contacts to his personal email address and downloaded numerous confidential files to a personal USB drive—with one of the downloads taking place on the same day that Jensen incorporated Farco USA. It is reasonable to infer from these allegations that these actions were not part of Defendants' normal course of employment. Szurgot and Blasik lied to Sagent investigators, and Blasik forwarded emails from FARCO-PHARMA to his personal email address and then deleted them from his work email. Szurgot was asked to review a letter from FARCO-PHARMA to Sagent purporting to terminate the LSA early. These allegations, if true, when considered in concert with the multitude of communications between Vollenbroeker, Szurgot, and Blasik, plausibly establish misappropriation at the pleading stage with respect to Szurgot and Blasik. *See SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, at *5, (N.D. Ill. 2014) (misappropriation allegations sufficient where the defendants forwarded emails containing trade secrets to personal email accounts, immediately joined a competitor after resigning, removed documents containing trade secrets, attempted to cover their tracks by deleting emails sent to their personal email address). The allegations are not enough, however, to state a claim against Jensen.

However, Sagent also argues it plausibly pleaded inevitable disclosure. Courts look at three factors for inevitable disclosure: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent use or disclosure

11

of former employer's trade secrets. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 (N.D. Ill. 2020) (citation omitted). In addition, the former employer must demonstrate an "intent or a high probability" that employee will use trade secrets. *Id.* (quoting *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011)). Defendants contend that the nature of the alleged trade secrets emailed and downloaded—hospital contact lists, term sheets, and marketing materials—are the kind that an employee could choose to avoid, negating inevitability.

"The mere fact that a person holds 'general skills and knowledge acquired during his tenure' with his former employer and then 'assume[s] a similar position at a competitor' does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information' in his new position." *Lumenate Techs.*, 2013 WL 5974731, at *6 (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)). "Allegations that the new employer assigned the defendant to work on the same projects he had worked on for his previous employer, however, support an inference of inevitable disclosure, as do allegations that the defendant downloaded his former employer's trade secret information before leaving the company." *Id.* (internal citations omitted); *see also Insight Glob., LLC v. Borchardt*, 2018 WL 2267810, at *4 (N.D. Ill. 2018) (denying motion to dismiss because "facts alleged in the Complaint of [the defendant's] immediate employment with a competitor doing the same type of work, when coupled with evidence that she took materials from the company prior to leaving,

12

are sufficient to infer the possibility that [the defendant] misappropriated trade secrets.").

Defendants argue that Farco USA is not alleged to have ever sold a single product in competition with Sagent, and Farco USA is alleged to have only $30,000 in funding. But Sagent alleges that Farco USA was created to compete in the same national market Defendants oversaw at Sagent, and to specifically to replace Sagent as the distributor of GLYDO once the LSA terminates. It can reasonably be inferred from the allegations in the complaint that additional funding and an exclusive distribution relationship with FARCO-PHARMA are forthcoming.

In addition to the multiple communications between Szurgot, Blasik, and Vollenbroeker, in an email introducing Szurgot to an investment banker, a friend of Szurgot noted that the LSA "is ending soon and Bob is working with the German company to start up a new company dedicated to the distribution of the current and future product lines including a significant investment in the new company[.]" Dkt. # 1, ¶ 111. Szurgot and Blasik downloaded confidential information before leaving and attempted to conceal their activities from Sagent. Jensen funded and incorporated Farco USA. The allegations suggest Defendants have "done more than legally compete in the normal course of business." *Packaging Corp. of Am.*, 419 F. Supp. 3d at 1069.

It can also be reasonably inferred from Sagent's allegations that the Szurgot, Blasik, and Jensen are poised to hold positions at Farco USA—which, again, was allegedly created to replace Sagent as FARCO-PHARMA's U.S. distributor—similar

13

to those held at Sagent. And as to whether Defendants have taken steps to prevent themselves from using Sagent's trade secrets, it appears there are none, at least none are alleged in the complaint—which is not surprising given Defendants created Farco USA. All told, Sagent has pleaded sufficient facts under a theory of inevitable disclosure as to all three individual defendants. *See*, *e.g.*, *CZS Holdings LLC v. Kolbe*, 2021 WL 1837385, at *4 (N.D. Ill. 2021) (defendant created a competing business in the same geographical area he once oversaw, it was plausible that all specialized knowledge came from his employment with the plaintiff because he had never worked in the business before, and unless the defendant "possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [the new company] by relying on his knowledge of [the plaintiff's] trade secrets" (internal quotation marks and citation omitted)).

Moving forward, of course, Sagent "ultimately will bear the burden of *proving*— not just alleging—enough facts such that disclosure is not premised on a mere unsubstantiated fear." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *7 (N.D. Ill. 2017) (citations omitted). The claims survive for now.

## II. Injunctive Relief

Defendants argue that even if the Court does not dismiss the misappropriation of trade secrets claims, the Court should strike Sagent's requests for injunctive relief in those claims. Sagent says this argument is premature, and the Court agrees. Sagent has plausibly pleaded misappropriation claims, and the parties "are welcome to dispute the

precise tailoring of the injunctive relief at a later time." *Insight Glob.*, 2018 WL 2267810, at *4.

### III. Tortious Interference with Contract

To state a claim for tortious interference with contract, Sagent must allege facts sufficient to establish: (1) a valid contract, (2) Defendants' knowledge of the contract, (3) Defendants' intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by Defendants' wrongful conduct, and (5) damages. *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55 (1989). Defendants argue this claim fails because Sagent cannot establish an actual breach of the LSA or damages, as Sagent and FARCO-PHARMA continue to do business today. Sagent responds that there need not be a termination of the contract to state a tortious interference claim. This is true, *see RSA Props. Mission Hills, P.C. v. Mission Hills Homeowners Ass'n*, 2024 IL App (1st) 231526, ¶ 46, however, there still must be an actual breach of the contract. *See Cartwright v. Cooney*, 788 F. Supp. 2d 744, 754 (N.D. Ill. 2011) (a plaintiff cannot maintain a tortious interference with contract claim absent allegations of a breach of contract).

While Sagent argues that its allegations of anticipatory repudiation[2] by FARCO-PHARMA suffice to establish the breach element of its tortious interference claim,[3] it cites no authority where a court has accepted such a position. The claim is dismissed without prejudice.

## IV. Tortious Interference with Prospective Economic Advantage

Under Illinois law, "to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva,* 142 Ill. 2d 495, 511–12 (1991). Defendants argue this claim fails because Sagent has failed to allege a reasonable business expectancy and failed to allege it has been damaged by the termination of said business expectancy.

---

[2] "When one party anticipatorily breaches a contract, the non-breaching party generally has three options: (1) to rescind the contract altogether and pursue the remedies based on the rescission; (2) to elect to treat the repudiation as an immediate breach by bringing suit or by making some change in position; or (3) to await the time for performance of the contract and bring suit after that time has arrived." *Tower Invs., LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1032 (2007). Sagent and FARCO-PHARMA are still performing under the LSA.

[3] The fact that FARCO-PHARMA purportedly attempted to prematurely terminate the LSA in 2023 and again in 2024 but "backed off" of those attempts casts some doubt on Sagent's argument that a breach is imminent.

Defendants correctly note that a mere "track record" of doing business with a particular customer is not to establish a reasonable expectation of future business. *See, e.g., Automated Concepts, Inc. v. Weaver*, 2000 WL 1134541, at *7 (N.D. Ill. 2000) ("The fact that ACI has a "track record" of receiving work from a particular customer in the past, in and of itself, does not establish a reasonable expectation of ACI's entering into any particular future business relationship with such a customer."); *Int'l Serv. Assocs., Inc. v. Arco Mgmt.*, 1994 WL 583302, at *7 (N.D. Ill. 1994) ("First, a 'track record' of HUD awarding contracts to ISA, standing alone, does not establish a reasonable expectation of ISA's entering into any particular future business relationship with HUD."); *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012) ("[a] history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer."). Sagent, however, argues it has adequately alleged a reasonable expectancy based on a more than 14-year exclusive distribution relationship, an LSA with default automatic two-year renewals, substantial income from GLYDO distribution, and active joint venture discussions in January 2024. The Court finds Sagent's allegations sufficient at this stage.

As to damages, Defendants argue that because the LSA is not scheduled to terminate until December 31, 2026, Sagent's alleged harm is merely speculative. Sagent responds that Defendants' position ignores that FARCO-PHARMA has again declared its intent to terminate the LSA prematurely, and Sagent has incurred

17

substantial costs responding to that pronouncement, as well as in responding to the 2023 and 2024 attempts to terminate the LSA.

But the 2023 and 2024 termination attempts never came to fruition—FARCO-PHARMA "backed off." That Sagent bases its claim on the fact that FARCO-PHARMA has declared an intent to terminate the LSA early only highlights the speculative nature of the claimed damages. Perhaps FARCO-PHARMA will back off again. If it does not, Sagent stands poised to lose profits from GLYDO sales, and its case would be much stronger. But the two companies continue to do business. The tortious interference with prospective economic advantage claim is dismissed without prejudice.

## V.    Additional Claims Against Jensen

In addition to the misappropriation and tortious interference claims, Defendants also move to dismiss the claims against Jensen for breach of fiduciary duty, unfair competition, civil conspiracy, breach of contract, and unjust enrichment. The motion is denied as to each of these claims.

"To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must allege the following elements: "(1) a fiduciary duty on part of the defendant; (2) a breach of that duty; (3) damages; and (4) a proximate cause between the breach and the damages." *Pearson v. Garrett-Evangelical Theological Seminary, Inc.*, 790 F. Supp. 2d 759, 768–69 (N.D. Ill. 2011). Defendants argue Sagent does not properly allege that Jensen competed with Sagent during his employment, knew about or failed to disclose

18

to Sagent any facts related to any such competition, or otherwise breached any fiduciary duties. To the extent Sagent's claims are premised on allegations of misappropriation of trade secrets, those claims are preempted by ITSA and are dismissed. The remaining allegations, however, pass muster.

"As a general rule, employees may plan, form, and outfit a competing corporation while still working for the employer, but they may not commence competition." *Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 736 (2009). Sagent has pointed out fundamental conflicts of interest that preceded the end of Jensen's employment and plausibly alleges conduct by Jensen that goes beyond "mere planning." Farco USA, incorporated and funded by Jensen, was created for the express purpose of taking away Sagent's business with FARCO-PHARMA. For the same reasons, the motion to dismiss is denied with respect to the unfair competition claim.

The civil conspiracy claim against Jensen also remains. Defendants' argument that the allegations against Jensen in this regard are insufficient because his alleged co-conspirators did not move to dismiss this count lacks merit. In support of this claim, Sagent points to Vollenbroeker's December 2023 text to Szurgot stating he "will pimp up a little bit your/[Jensen's] business case (more details) and will send it to you. Based on your agreement this [business case] will be the basis for the loan. And then we should start the dance." Dkt. # 1, ¶ 61 (brackets in original). Sagent also highlights Jensen's role in the incorporation and funding of Farco USA. Given Vollenbroeker's text, it is plausible that Jensen knew about and was involved in Szurgot's and Blasik's

plans with FARCO-PHARMA from the very beginning, while he was still employed by Sagent. Sagent has stated a plausible civil conspiracy claim against Jensen.

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25 (quoting *HPI Health Care Servs.*, 131 Ill. 2d at 160. Sagent alleges Jensen was actively working against Sagent's interests while he was employed by Sagent and at the time he was let go, yet he accepted wages and other compensation at Sagent's expense. This is enough, for now.

Lastly, with respect to breach of contract, Sagent accuses Jensen of breaching both his Confidentiality Agreement and his Separation Agreement. Jensen purportedly breached the Confidentiality Agreement "by using and divulging Sagent's confidential information and property for his own benefit, engaging in other business activity related to Sagent's business, including activities that directly conflicted with his obligations to Sagent without obtaining the prior written consent of Sagent, and using Sagent's confidential information to cut out Sagent's ability to continue to sell and distribute GLYDO." Dkt. # 1, ¶ 225. Jensen purportedly breached the Separation Agreement "by falsely representing that he had not engaged in—and was unaware of—any unlawful conduct relating to Sagent's business." *Id.* ¶ 230. Sagent's allegations suggest that Jensen was aware of Szurgot's and Blasik's plans from the beginning, and he was thus

20

actively working against Sagent's interests while still employed by Sagent and at the time he was let go. At this early stage, Sagent's allegations are sufficient to state a claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' partial motion to dismiss [29] is granted in part and denied in part. The motion granted as to the tortious interference claims against all Defendants and denied as to the DTSA and ITSA claims against all Defendants. The motion is further denied with respect to the breach of fiduciary duty, unfair competition, civil conspiracy, breach of contract, and unjust enrichment claims against Jensen. Sagent is granted leave to file an amended complaint by 5/27/2026, if it wishes to do so. A telephonic status hearing is set for 6/23/2026 at 10:00 a.m.

Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Date: May 5, 2026

21